HONORABLE RICHARD A. JONES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

NORTHWEST IMMIGRANT
RIGHTS PROJECT, et al.,

                    Plaintiffs,

        v.

JEFFERSON B SESSIONS, III, et al.,

                    Defendants.

CASE NO. C17-716 RAJ

ORDER

## I.      INTRODUCTION

This matter comes before the Court on Plaintiffs Northwest Immigrant Rights
Project's ("NWIRP") and Yuk Man Maggie Cheng's Motion for Preliminary Injunction.[1]
Dkt. # 37.  The Government opposes the Motion.[2]  Dkt. # 47.  On July 24, 2017, the
Court heard oral arguments on the matter.  Dkt. # 64.  For the reasons set forth below, the
Court **GRANTS** Plaintiffs' Motion and converts the temporary restraining order into a
preliminary injunction pursuant to the terms stated below.

---

[1] The Court refers to the Plaintiffs collectively as "NWIRP" or "Plaintiffs."
[2] The Court refers to the Defendants collectively as "EOIR" or "the Government."

ORDER- 1

1    **II.    BACKGROUND**

2    Washington nonprofit Northwest Immigrant Rights Project ("NWIRP") provides

3    free and low-cost legal services to thousands of immigrants each year.  Dkt. # 1.  The

4    Executive Office for Immigration Review ("EOIR"), an office within the Department of

5    Justice ("DOJ"), oversees the adjudication of immigration cases.  *Id.* at ¶ 1.5.  In seeking

6    to improve immigrants' access to legal information and counseling, EOIR provides an

7    electronic list of pro bono legal services providers.  With regard to Washington, EOIR's

8    entire list of recognized pro bono organizations includes one group—NWIRP.  Dkt. ## 2

9    at 17, 3 (Warden-Hertz Decl.) at ¶ 4.

10    In December 2008, EOIR published new rules regulating the professional conduct

11    of attorneys who appear in immigration proceedings.  Specifically, EOIR reserved the

12    right to "impose disciplinary sanctions against any practitioner who . . . [f]ails to submit a

13    signed and completed Notice of Entry of Appearance as Attorney or Representative . . .

14    when the practitioner has engaged in practice or preparation as those terms are defined in

15    §§ 1001.1(i) and (k) . . . ."  8 C.F.R. § 1003.102(t) (hereinafter, "the Regulation").  EOIR

16    defines "practice" and "preparation" as follows:

17    The term practice means the act or acts of any person appearing

18    in any case, either in person or through the preparation or filing

19    of any brief or other document, paper, application, or petition

20    on behalf of another person or client before or with DHS, or

21    any immigration judge, or the Board [of Immigration Appeals].

22

23    The term preparation, constituting practice, means the study of

24    the facts of a case and the applicable laws, coupled with the

25    giving of advice and auxiliary activities, including the

26    incidental preparation of papers, but does not include the

27    lawful functions of a notary public or service consisting solely

1              of assistance in the completion of blank spaces on printed

2              Service forms by one whose remuneration, if any, is nominal

3              and who does not hold himself out as qualified in legal matters

4              or in immigration and naturalization procedure.

5 8 C.F.R. § 1001.1(i), (k).

6       The purpose of these amendments was to protect individuals in immigration

7 proceedings by disciplining attorneys when it is within "the public interest; namely, when

8 a practitioner has engaged in criminal, unethical, or unprofessional conduct or frivolous

9 behavior." Professional Conduct for Practitioners—Rules and Procedures, and

10 Representation and Appearances, 73 Fed. Reg. 76914-01, at *76915 (Dec. 18, 2008).

11 With these new rules, EOIR sought "to preserve the fairness and integrity of immigration

12 proceedings, and increase the level of protection afforded to aliens in those

13 proceedings. . . ." *Id.*

14       NWIRP recognizes the importance of attorney accountability, especially in the

15 immigration context. Indeed, NWIRP became an ally to EOIR in its efforts to combat

16 "notario fraud."[3] Dkt. # 1 (Complaint) at ¶ 3.12. However, NWIRP also recognizes that

17 the Regulation poses challenges because NWIRP does not have the resources to

18 undertake full representation of each potential client. *Id.* at ¶¶ 3.5, 3.21-3.23. To address

19 these challenges, NWIRP alleges that it "met with the local immigration court

20 administrator" soon after the Regulation was adopted to discuss the Regulation's impact

21 and "agreed that it would notify the court when it assisted with any pro se motion or brief

22 by including a subscript or other clear indication in the document that NWIRP had

23

24

25

26       [3] "Notario fraud" refers to "immigration consultants who are engaging in the unauthorized practice of law by using false advertising and fraudulent contacts and holding themselves out as qualified to help immigrants obtain lawful status, or performing legal functions such as drafting wills or other legal

27 documents." Dkt. # 1 (Complaint) at 6 (internal punctuation omitted).

1  prepared or assisted in preparing the motion or application." *Id.* at ¶ 3.11; *see also* Dkt. #

2  38 (Baron Decl.) at ¶ 5.

3      Nearly nine years after promulgating the Regulation, EOIR sent a cease and desist

4  letter to NWIRP asking the nonprofit to stop "representing aliens unless and until the

5  appropriate Notice of Entry of Appearance form is filed with each client that NWIRP

6  represents." Dkt. # 1 (Complaint) ¶ 3.14. EOIR's letter acknowledged that the disputed

7  forms on which NWIRP assisted "contained a notation that NWIRP assisted in the

8  preparation of the *pro se* motion." Dkt. # 1-1.

9      NWIRP filed suit against EOIR and others seeking injunctive relief from the

10  enforcement of the Regulation. *See generally* Dkt. # 1 (Complaint). In moving for a

11  temporary restraining order ("TRO"), NWIRP sought to maintain the status quo until the

12  parties could be heard on a motion for preliminary injunction. Dkt. # 21.

13      On May 17, 2017, the Court heard oral arguments on the TRO. Dkt. # 31. The

14  Court questioned the parties and discovered, among other things, that the Government

15  had no evidence that NWIRP had engaged in substandard legal representation. Dkt. # 36

16  (Transcript of TRO Hearing) at 39.

17      Finding that Plaintiffs met their burden under the TRO standard, the Court granted

18  the TRO. Dkt. # 33. The parties are now before the Court to argue whether the Court

19  should convert the TRO into a preliminary injunction.

20  **III.    LEGAL STANDARD**

21      Plaintiffs seek a preliminary injunction enjoining the Government from enforcing

22  the notice of appearance regulation codified at 8 C.F.R. § 1003.102(t)(1). "A preliminary

23  injunction is an extraordinary and drastic remedy; it is never awarded as of right . . . ."

24  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation and internal quotation marks

25  omitted). To obtain a preliminary injunction, the moving party must establish that: (1) it

26  is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence

27

ORDER- 4

1  of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is

2  in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).

3       Alternatively, "serious questions going to the merits" and a balance of hardships

4  that tips sharply towards the plaintiffs can support issuance of a preliminary injunction,

5  so long as plaintiffs also show that there is a likelihood of irreparable injury and that the

6  injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

7  1127, 1135 (9th Cir. 2011).

8      **IV.    DISCUSSION**

9       Plaintiffs allege claims for facial and as-applied violations of the First and Tenth

10  Amendment.  The Court will discuss the merits of each claim below.

11      **A. First Amendment**

12       At issue are Plaintiffs' actions in offering pro bono legal assistance to immigrants

13  subject to removal proceedings.  Such actions fall within the protections afforded by the

14  First Amendment.  *See In re Primus*, 436 U.S. 412, 426 (1978) ("Subsequent decisions

15  have interpreted *Button* as establishing the principle that 'collective activity undertaken to

16  obtain meaningful access to the courts is a fundamental right within the protection of the

17  First Amendment.'") (citations omitted); *United Transp. Union v. State Bar of Mich*., 401

18  U.S. 576, 580 (1971) (finding that the First Amendment protected the Union's ability to

19  give legal advice or counsel to an injured worker or his family concerning a FELA

20  claim); *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) ("Attorneys have rights to

21  speak freely subject only to the government regulating with 'narrow specificity.'") (citing

22  *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963)).

23       This case falls neatly within the precedent set by the Supreme Court in *Button* and

24  its progeny.  This line of authority embodies the principle that non-profit organizations

25  may not be threatened when "advocating lawful means of vindicating legal rights."

26  *Button*, 371 U.S. at 437.  In *Button*, the Supreme Court invalidated a Virginia statute

27  aimed at proscribing "solicitation of legal business by a 'runner' or 'capper,' [which

1   included] in the definition of 'runner' or 'capper,' an agent for an individual or

2   organization which retains a lawyer in connection with an action to which it is not a party

3   and in which it has no pecuniary right or liability." *Id.* at 423.  Virginia claimed that the

4   statute's purpose was to "further control the evils of solicitation of legal business." *Id.* at

5   424.  The NAACP had for many years, without incident, openly solicited legal business

6   to further desegregation efforts. *Id.* at 423.  But Virginia courts found that these activities

7   were prohibited under the new iteration of the statute. *Id.* at 426.  The Supreme Court

8   saw through this targeted enforcement, recognizing "a record devoid of any evidence of

9   interference by the NAACP in the actual conduct of litigation, or neglect or harassment

10  of clients[.]" *Id.* at 433.  Though acknowledging Virginia's otherwise valid efforts to

11  restrain the "oppressive, malicious, or avaricious use of the legal process for purely

12  private gain," the Supreme Court rejected those efforts as applied to the NAACP. *Id.* at

13  443.  The statute's justifications were simply not applicable to the NAACP's actions and

14  they highlighted the reality of that era:

15              [T]he militant Negro civil rights movement ha[d] engendered

16              the  intense  resentment  and  opposition  of  the  politically

17              dominant white community of Virginia; litigation assisted by

18              the NAACP ha[d] been bitterly fought.  In such circumstances,

19              a statute broadly curtailing group activity leading to litigation

20              may  easily  become  a  weapon  of  oppression,  however

21              evenhanded its terms appear.  Its mere existence could well

22              freeze out of existence all such activity on behalf of the civil

23              rights of Negro citizens.

24  *Id*. at 435–36.

25       In *United Transportation Union v. State Bar of Michigan*, the Supreme Court

26  emphasized the broad application of *Button*.  There, the Court refused to allow the

27  Michigan State Bar to enjoin the Union "from engaging in activities undertaken for the

1  stated purpose of assisting their fellow workers, their widows and families, to protect

2  themselves from excessive fees at the hands of incompetent attorneys in suits for

3  damages under the Federal Employers' Liability Act." *United Transp. Union*, 401 U.S. at

4  577.  The Court reversed the Michigan Supreme Court's narrow holdings, finding that the

5  First Amendment broadly protects groups who "unite to assert their legal rights as

6  effectively and economically as possible." *Id.* at 580.  In doing so, the Court rejected the

7  State Bar's insistence on a restrictive interpretation of the injunction; such an

8  interpretation was so vague that it would "jeopardize the exercise of protected freedoms."

9  *Id.* at 581.  *United Transportation Union* made clear that "collective activity undertaken

10  to obtain meaningful access to the courts is a fundamental right within the protection of

11  the First Amendment." *Id.* at 585.

12       Non-profit organizations whose "primary purpose[ is] the rendition of legal

13  services" share equally in the fundamental protections of association and expression

14  described in *Button*.  *In re Primus*, 436 U.S. at 427 (internal quotations and citations

15  omitted).  In *Primus*, the Supreme Court leaned heavily on the precedent set by *Button* to

16  invalidate South Carolina's professional ethics rule against solicitation.  *In re Primus*,

17  436 U.S. 412.  The Court had no issue extending the protections set forth in *Button* to an

18  attorney associated with the ACLU because, in that context, the organization was

19  interchangeable with the NAACP: both organizations educate the public, lobby for

20  specific civil-rights related causes, and devote time and resources to specific litigation

21  involving those civil-rights related causes.  *Id.* at 427.  Like it did in *Button*, the Court

22  acknowledged the political undercurrent—wherein pregnant mothers were threatened

23  with sterilization to maintain their Medicaid benefits—and the ACLU's engagement "in

24  the defense of unpopular causes and unpopular defendants." *Id.* at 427.  The Court

25  recognized that the ACLU's litigation practice "has defined the scope of constitutional

26  protection in areas such as political dissent, juvenile rights, prisoners' rights, military law,

27  amnesty, and privacy." *Id.* at 427-28.  Building on the conclusions from *Button*, the

ORDER- 7

1 Court embraced the idea that "efficacy of litigation as a means of advancing the cause of

2 civil liberties often depends on the ability to make legal assistance available to suitable

3 litigants." *Id.* at 431. With these circumstances in mind, the Court concluded that South

4 Carolina's disciplinary rule invaded "the generous zone of First Amendment protection

5 reserved for associational freedoms." *Id.* at 431-32. Without "proof of any of the

6 substantive evils" that the rule aimed at preventing, South Carolina's vague disciplinary

7 rule failed to withstand strict scrutiny. *Id.* at 433. The Court was quick to qualify its

8 ruling by reiterating that states are free to reasonably regulate members of their Bars, but

9 such regulations must be "narrowly drawn" to proscribe conduct that "in fact is

10 misleading, overbearing, or involves other features of deception or improper influence."

11 *Id.* at 438. Many times these regulations may be upheld as applied to individuals seeking

12 pecuniary gain; it is doubtful, though, that such regulations will be applicable to non-

13 profit organizations such as the ACLU or NAACP. *See, e.g.*, *Ohralik v. Ohio State Bar*

14 *Ass'n*, 436 U.S. 447 (1978).

15       Though framed around the protected freedoms of association and expression, these

16 cases nonetheless support Plaintiffs' position. Therefore, to survive the Motion, the

17 Regulation "must withstand the 'exacting scrutiny applicable to limitations to core First

18 Amendment rights.'" *In re Primus*, 436 at 432 (quoting *Buckley v. Valeo*, U.S. 1, 44-45

19 (1976)). To do so, the Government must demonstrate a compelling interest that is

20 narrowly tailored "to avoid unnecessary abridgment" of First Amendment freedoms. *Id.*

21       NWIRP is a non-profit organization that provides education to the community,

22 advances its cause through systemic advocacy, and provides legal assistance to

23 immigrants navigating the legal system, often in the context of removal proceedings.

24 Dkt. ## 1 (Complaint) at ¶¶ 1.1, 3.1-3.3; 37 at 12. NWIRP is the primary non-profit legal

25 services provider in Washington State, making it essential to low-income and indigent

26 immigrants. Dkt. # 37 at 12. The Government agrees that the work done by NWIRP and

27 similar non-profit organizations is crucial and admirable. Dkt. ## 36 (Transcript of TRO

ORDER- 8

1  Hearing) at 37-38, 45; 47 at 11-13 (explaining EOIR's commitment to ensuring that

2  immigrants have available quality representation).  Moreover, the Government does not

3  dispute NWIRP's contention that the Regulation would deprive this "vulnerable

4  population" of representation, essentially leading to an increase in avoidable deportations.

5  Dkt. ## 47 at 11; 39-35 (Murray Decl.) at ¶ 4.  The dichotomy between the Government's

6  recognition of the importance of legal representation and acknowledgment that the

7  Regulation will result in decreased services lays bare an uncomfortable reality.  The

8  effect of the Regulation as interpreted by the Government will be the inevitable chipping

9  away at attorneys' fundamental rights.  Under the circumstances of this case, EOIR is

10  blindly seeking to impose its rules and regulations and spin precedent in a manner

11  inconsistent with fairness.  As W.E.B. DuBois once wrote, "[r]ule-following, legal

12  precedence, and political consistency are not more important than right, justice and plain

13  common-sense."

14    Similar to the states in *Button* and *Primus*, the Government justifies its Regulation

15  by citing a host of evils associated with attorneys failing to file notices of appearances.

16  Dkt. ## 47 at 14-17, 49 (Barnes Decl.) at ¶ 28-39.  The Court does not deny that the

17  Government's stated concerns are relevant to ensuring high quality representation in the

18  immigration courts.  In fact, the Court applauds the existence of regulations that seek to

19  protect the rights of a vulnerable class of people.  The Court does not find that *Button* and

20  its progeny foreclose the Government's authority to regulate the conduct of lawyers,

21  generally.  However, the Government may not regulate in a way that chills the ability of

22  non-profit organizations to obtain meaningful access to the courts, especially when that

23  access is sought to advance civil-rights objectives.  In this context, the Government may

24  regulate "only with narrow specificity." *In re Primus*, 436 U.S. at 425 (citing *Button*, 371

25  U.S. at 433).  The Government has not done so in this instance.

26    The Government's key objective in promulgating and enforcing the Regulation is

27  to prevent notarios, as well as incompetent, unethical, unauthorized, or fraudulent

ORDER- 9

1   individuals from exploiting the plight of vulnerable immigrants.  Dkt. ## 36 (Transcript

2   of TRO Hearing ) at 42, 47 at 15.  Central to enforcement is the Government's ability to

3   identify the practitioner who engaged in the unethical behavior and hold this individual

4   accountable.  *Id.* at 14-15.  Here, the Government lacks any evidence that NWIRP

5   committed wrongdoing or provided subpar representation to immigrants.  Dkt. # 36

6   (Transcript of TRO Hearing) at 39-40; *see, generally*, Dkt. # 47.  Moreover, even if there

7   were evidence, the Government had no trouble identifying the author of the documents.

8   There is no evidence or record before the Court of NWIRP having ever failed to clearly

9   advise the immigration court of its participation in any litigation.  NWIRP

10  unambiguously identified itself on documents and indicated whether the organization

11  provided assistance.  Dkt. ## 49 (Barnes Decl.) at ¶¶ 50-52, 37 at 14.  Because of this,

12  EOIR was able to contact NWIRP's Legal Director.  Dkt. # 49 (Barnes Decl.) at ¶ 54.  It

13  is questionable whether an actual notario or ne'er-do-well would have so clearly

14  identified himself such that EOIR could attempt enforcement in the same way.  Even if

15  the Government's reasons for the Regulation could rise to a compelling level, the

16  Regulation is not narrowly tailored to achieve its own ends.[4]  As in *Button*, the

17  Government has failed to advance any substantial regulatory interest, in the form of

18  substantive evils flowing from NWIRP's activities, which can justify the broad

19  prohibitions which it has imposed.  *See Button*, 371 U.S. at 442-43.  Nothing in the

20  record justifies the breadth and vagueness of the Government's interpretations of the

21  Regulation.

22

23

24

25      [4] During the hearing on the TRO, the Government argued that NWIRP's transparency is not
    enough.  The Government wished to have "the name, the address of the attorney or practitioner, they can
    list a bar license number, so that the parties can verify whether there is actual bar membership."  Dkt. # 36
26  (Transcript of TRO Hearing) at 41.  As such, it appears that NWIRP could adjust its stamps in a way that
    allows EOIR to identify the author with more precision without submitting to full representation.

27

1    The Regulation is not only too broad, it is impermissibly vague.  The Government

2  created a moving target with regard to the definition of "practice" or "preparation."

3  Section 1001.1(k) describes "preparation" as "the study of the facts of a case and the

4  applicable laws, coupled with the giving of advice and auxiliary activities," which could

5  include the mere "incidental preparation of papers."  8 C.F.R. § 1001.1(k).  NWIRP

6  sought guidance from EOIR regarding which actions constitute "preparation" such that

7  an attorney would need to file a notice of appearance.  Dkt. # 52 at 9.  EOIR indicated

8  that workshops aimed at assisting immigrants complete asylum forms may trigger the

9  Regulation.  *Id.*  During the TRO hearing, the Government was unable to offer a static

10  definition or example of "preparation," instead claiming that experienced lawyers will

11  "understand what providing legal advice is."  Dkt. # 36 (Transcript of TRO Hearing) at

12  58-59.  In this case, the "I know it when I see it" approach is outside the realm of "narrow

13  specificity" required by the First Amendment.  In its brief opposing a preliminary

14  injunction, the Government sought to delineate what NWIRP could do without triggering

15  the notice of appearance requirement.  Dkt. # 47 at 23.  But the Government immediately

16  blurred the line by asserting that "EOIR applies section 1003.102(t) only to in court

17  statements," thereby claiming the Regulation affects only those speaking in a nonpublic

18  forum.  *Id.* at 27, 42.[5]  "Precision of regulation must be the touchstone in an area so

19  closely touching our most precious freedoms."  *Button*, 371 U.S. at 438.  "In sum, the

20  [Regulation] in [its] present form [has] a distinct potential for dampening the kind of

21  'cooperative activity that would make advocacy of litigation meaningful,' as well as for

22  permitting discretionary enforcement against unpopular causes."  *In re Primus*, 436 U.S.

23  at 433 (quoting *Button*, 371 U.S. at 438).

24

25

26    [5] Of course, this cannot be the case.  Attorneys who speak in such a forum—that is, as a
representative inside the courtroom—have presumably filed a notice of appearance.  It seems, then, that
27  the Regulation must be triggered prior to an attorney's in-court appearance.

1    A regulation withstands intermediate scrutiny only if is "justified without

2  reference to the content of the regulated speech, [is] narrowly tailored to serve a

3  significant governmental interest, and . . . leave[s] open ample alternative channels for

4  communication of the information." *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014)

5  (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  The Government's

6  failure to narrowly tailor the Regulation or "leave open ample alternative channels for

7  communication of the information" dooms it even under intermediate scrutiny.  *Id.*  EOIR

8  presents NWIRP with a Hobson's choice: NWIRP must either fully represent or fully

9  refuse to represent an immigrant.  Or, NWIRP could maintain the status quo by offering

10 immigrants limited representation and face serious consequences.  On the other hand,

11 EOIR is equipped to promulgate or interpret regulations in ways that satisfy its

12 significant interest in promoting accountability without invading the First Amendment's

13 guarantees.  As such, the Regulation cannot withstand intermediate scrutiny; Plaintiffs

14 are likely to succeed on their First Amendment claim.

15    The majority of briefing—both by the parties and amici—focuses on how this

16 Regulation affects NWIRP and similarly situated non-profit organizations.  Dkt. ## 37,

17 40, 47.  The Court can conceive of situations—most likely when private attorneys

18 represent immigrants with expectation of remuneration—in which EOIR could

19 constitutionally enforce the Regulation.  *Foti v. City of Menlo Park*, 146 F.3d 629, 635

20 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998).  For that reason, the Court

21 limits its ruling at this early stage to Plaintiffs' as-applied challenge.

22    **B.  Tenth Amendment**

23    Plaintiffs argue that the Regulation violates Washington's right to regulate its

24 attorneys under the Tenth Amendment.  Dkt. # 37.  Regulating and licensing attorneys is

25 a matter left to the states.  *Leis v. Flynt*, 439 U.S. 438, 442 (1979).  "But 'the law of the

26 State, though enacted in the exercise of powers not controverted, must yield' when

27

1  incompatible with federal legislation." *Sperry v. State of Fla. ex rel. Fla. Bar*, 373 U.S.

2  379, 384 (1963) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824)).

3  It is well established that Congress may authorize agencies to regulate attorneys

4  appearing before them. *See Sperry*, 373 U.S. 379; *Goldsmith v. U.S. Bd. of Tax Appeals*,

5  270 U.S. 117 (1926); *Koden v. U.S. Dep't of Justice*, 564 F.2d 228 (7th Cir. 1977);

6  *Touche Ross & Co. v. Sec. & Exch. Comm'n*, 609 F.2d 570 (2nd Cir. 1979).  In such

7  cases,

8  A State may not enforce licensing requirements which,

9  though valid in the absence of federal regulation, give the

10  State's licensing board a virtual power of review over the

11  federal determination that a person or agency is qualified and

12  entitled to perform certain functions, or which impose upon

13  the performance of activity sanctioned by federal license

14  additional conditions not contemplated by Congress.

15  *Sperry*, 373 U.S. at 385.

16  Congress authorized EOIR to regulate the conduct of attorneys appearing before it.

17  8 U.S.C. §§ 1103(g), 1362.  As such, EOIR may impose requirements on its practitioners

18  that Washington does not.  Accordingly, Plaintiffs' argument that EOIR may not regulate

19  attorneys differently than Washington is unlikely to succeed on the merits.  As noted,

20  however, Plaintiffs' likelihood of success on their First Amendment claim is sufficient to

21  warrant the entry of a preliminary injunction.

22  **C. Irreparable Harm**

23  Plaintiffs have met their burden to show they have suffered and will continue to

24  suffer irreparable harm.  This Order makes clear that Plaintiffs' "First Amendment rights

25  were either threatened or in fact being impaired at the time relief was sought." *Elrod v.*

26  *Burns*, 427 U.S. 347, 373 (1976).  "The loss of First Amendment freedoms, for even

27

ORDER- 13

1  minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (citing *New*

2  *York Times Co. v. U.S.*, 403 U.S. 713 (1971)).

3        Prior to the Court's issuance of a TRO, and in order to abide by the Government's

4  cease and desist letter, Plaintiffs refrained from assisting at least four individuals.  Dkt.

5  ## 37 at 30, 4 at ¶ 12.  Were the injunction lifted, Plaintiffs would likely encounter

6  additional harm in being deprived of continuing their mission.  *Button*, 371 U.S. at 435

7  ("It makes no difference whether such prosecutions or proceedings would actually be

8  commenced.  It is enough that a vague and broad statute lends itself to selective

9  enforcement against unpopular causes.").[6]

10       That Plaintiffs may withdraw representation with leave of court is no solution.  *See*

11 Dkt. # 47 at 34.  Quite simply, "[t]his misses the point."  *Legal Servs. Corp. v. Valazquez*,

12 531 U.S. 533, 546 (2001).  As applied to NWIRP, the Regulation threatens to "smother[]

13 all discussion looking to the eventual institution of litigation on behalf of the rights of

14 members of an unpopular minority."  *Button*, 371 U.S. at 434.  Just as NWIRP lacks

15 resources to undertake full representation of each immigrant, it likely lacks resources to

16 undertake full representation and then seek withdrawal.  Moreover, if attorneys were able

17 to assume full representation and then withdraw with impunity, the evils that EOIR seeks

18 to remedy might instead be exacerbated.

19       **D.  Balance of Equities & Public Interest**

20       Plaintiffs have met their burden to show that the balance of equities and public

21 interest weigh in favor of granting the preliminary injunction.  The parties agree that

22 providing quality representation to vulnerable immigrants is a high priority.  Moreover,

23 the Government is not harmed by allowing NWIRP and other similarly situated

24 organizations from continuing to provide competent representation.  This is especially

25

26

27       [6] As the myriad of attached declarations attest, NWIRP and other organizations may lose
the ability to receive aid in furthering their cause. *See* Dkt. # 39 (Allen Decl.).

ORDER- 14

1   true in light of the Court's narrow ruling that authorizes EOIR to enforce the Regulation

2   against those private attorneys who may actually be engaging in the evils so described.

3   Finally, "it is always in the public interest to prevent the violation of a party's

4   constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citations

5   and internal quotation marks omitted).

6          **V.      PRELIMINARY INJUNCTION**

7          1.      Plaintiffs' Motion for Preliminary Injunction (Dkt. 37) is **GRANTED**.

8          2.      Defendants Jefferson B. Sessions III, the United States Department of

9   Justice, the Executive Office for Immigration Review, Juan Osuna, and Jennifer Barnes,

10  and all of their officers, agents, servants, employees, attorneys, successors, assigns, and

11  persons acting in concert or participation with them are hereby **ENJOINED** and

12  **RESTRAINED** from:

13       (a)     Enforcing the cease and desist letter, dated April 5, 2017, from Defendant

14  Barnes and EOIR's Office of General Counsel to NWIRP; and

15       (b)     Enforcing or threatening to enforce 8 C.F.R. § 1003.102(t) against Plaintiffs

16  and all other attorneys under their supervision or control, or who are otherwise associated

17  with them.

18         3.      The Preliminary Injunction is granted on a nationwide basis as to any other

19  similarly situated non-profit organizations who, like NWIRP, self-identify and disclose

20  their assistance on *pro se* filings.  Therefore, the Court prohibits the enforcement of 8

21  C.F.R. § 1003.102(t) during the pendency of this preliminary injunction on a nationwide

22  basis.

23         4.      No security bond is required under Federal Rule of Civil Procedure 65(c).

24         5.      This preliminary injunction shall remain in effect until further Order of this

25  Court.

26  //

27  //

ORDER- 15

1

## VI.    CONCLUSION

2          For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion.  Dkt. # 37.  The

3    Government is enjoined from enforcing the Regulation against NWIRP and any other

4    similarly situated organizations, as outlined above.

5

6          Dated this 27th day of July, 2017.

7

8

9    _____

10          The Honorable Richard A. Jones
          United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORDER- 16